JS 44   (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Timothy Patrick Murphy

**DEFENDANTS**
Vinson Law Office, PA, Ben A. Vinson, Jr., Mark A. Alonzo and Zane T. Cagle

**(b)** County of Residence of First Listed Plaintiff   Wayne County, Michigan
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                          *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332(a)(1)
Brief description of cause:
Fraudulent inducement, fraudulent misrepresentations and conversions in contract to file and prosecute civil action.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** 225,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
July 22, 2024

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?          ☐ Yes
                                                                        ☑ No

     If yes, give the following information:

     Court: _____

     Case No.: _____

     Judge: _____


2.          Other than stated above, are there any pending or previously
            discontinued or dismissed companion cases in this or any other     ☐ Yes
            court, including state court? (Companion cases are matters in which ☑ No
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

     If yes, give the following information:

     Court: _____

     Case No.: _____

     Judge: _____


Notes :

[ Save ]  [ Print ]  [ Reset ]  [ Exit ]

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TIMOTHY PATRICK MURPHY,

Plaintiff,

vs.

VINSON LAW OFFICE PA, a Florida
Corporation, BEN A. VINSON, JR.,
MARK A. ALONZO, and ZANE T.
CAGLE, Jointly and Severally,

Defendants.

Case No.
HONORABLE

**COMPLAINT**
**1. FRAUD IN THE INDUCEMENT**
**2. FRAUDULENT MISREPRESENATION**
**3. FRAUDULENT MISREPRESENATION**
**4. NEGLIGENT MISREPRESENATION**
**5. CONSPIRACY TO DEFRAUD**
**6. STATUTORY CONVERSION**
**7. BREACH OF FIDUCIARY DUTIES**
   **JURY DEMAND**

Case: 2:24−cv−11907

---

TIMOTHY PATRICK MURPHY
Plaintiff Pro Se
41640 White Tail Lane
Canton, Michigan 48188–2073
313–318–0310
timothypmurphy@murphyslaw82.com

Assigned To : Berg, Terrence G.
Referral Judge: Grand, David R.
Assign. Date : 7/23/2024
Description: CMP TIMOTHY
MURPHY V VINSON LAW OFFICE
ET AL (SS)

---

## PLAINTIFF'S COMPLAINT

For his Complaint, Plaintiff TIMOTHY PATRICK MURPHY ("Murphy")

states as follows:

### PARTIES

1.     Plaintiff, TIMOTHY PATRICK MURPHY, is a citizen of the State of

Michigan who resides in Canton Township, in Wayne County, within this judicial

district.

2.     Defendant BEN A. VINSON, JR., is a citizen of the State Florida and

1

the Chief Executive Officer of VLO, who does business at 5505 West Gray Street, Tampa, Florida. He is an attorney admitted to practice law in Florida.

3.     Defendant MARK A. ALONZO ("Alonzo") is a citizen of the State of Florida and the Chief Administrative Officer of VLO, who does business at 5505 West Gray Street, Tampa, Florida. He is an attorney admitted to practice law in Florida.

4.     Defendant ZANE T. CAGLE ("Cagle") is a citizen of the State of Missouri, who does business at 500 N. Broadway, Suite 1605, St. Louis, Missouri. He is an attorney admitted to practice law in Missouri and Illinois.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction under 28 U.S.C. § 1332(a)(1), based on the complete diversity of citizenship of Plaintiff and Defendants, and because the amount in controversy exceeds Seventy-Five Thousand Dollars.

6.     Venue is proper in this judicial district by operation of 28 U.S.C. §1391(b)(2), because a substantial part of the events or omissions giving rise to Murphy's claims occurred here.

## FACTS

7.     Murphy adopts by reference the preceding paragraphs pursuant to F. R. Civ. P. 10(c).

8.     Murphy is seventy-eight years old.

9.     Murphy is totally and permanently disabled by severe asbestosis.

10.    Severe asbestosis is a deadly form of pulmonary fibrosis, which is chronic, progressive, incurable, and typically causes death through respiratory failure within ten years of diagnosis.

11.    Murphy contracted asbestosis during his prolonged exposure to and ingestion of hazardous concentrations of asbestos fibers between August 13, 1965, and December 11, 1968, while he served in the United States Navy, aboard the destroyer *USS Frank E. Evans* (DD-754).

12.    Murphy's asbestosis first became symptomatic on or about January 1, 2015, but was not diagnosed until March 20, 2018.

13.    There are two separate American sources from which persons like Murphy who have been exposed to and ingested hazardous concentrations of asbestos fibers and have then contracted asbestosis may obtain financial compensation for the sequelae of asbestosis they endure.

14.     Compensation may be obtained from asbestos personal injury trusts, through special funds set up by companies facing significant legal liability due to asbestos-related lawsuits which have sought protection in bankruptcy. Pursuant to Chapter 11 and § 524(g) of the federal bankruptcy code, such a company may transfer its liabilities and certain assets to an asbestos personal injury trust, which is then responsible for compensating present and future claimants. About one hundred

companies have. Exhibit 1, at pages 2, 3, 17.

15.     Compensation may also be obtained in the conventional manner in the tort system, by prosecuting and prevailing in a civil action against solvent manufacturers, distributors, and users of asbestos products, when one has been exposed to their products, ingested asbestos fibers and developed an asbestos-related disease ("ARD").

16.     The asbestos trust funds claim process is typically quick, simple, and inexpensive. See Exhibit 1 at page 19, Figure 5: *Asbestos Trust Claim Process; Id,.* at 26 (expedited review process).

17.     For example, Murphy incurred costs of less than Six Hundred Dollars in the aggregate when collecting compensation from six asbestos trust fund claims he pursued without counsel, and each claim was approved and paid in less than six months from its submission.

18.     After being diagnosed with and disabled by his disease, Murphy learned that he could obtain compensation for the sequalae of asbestosis which he has endured from asbestos trust funds without prosecuting a civil action. *Id.*, at 7-9, 19.

19.     Murphy also had learned during his career as an attorney specializing in litigation that prosecuting a civil action against those parties responsible for his exposure to hazardous concentrations of asbestos fibers would be comparatively exponentially time-consuming, complex, and expensive.

20.     By way of example, the average time between the filing of a civil action and a verdict in St. Clair County, Illinois, where Murphy's civil action later described was filed exceeds sixty months, and the minimum costs incurred in preparing for and trying the typical asbestos case in that venue exceeds One Hundred Fifty Thousand Dollars.

21.     Murphy was employed as an attorney specializing in civil and criminal litigation, between 1976 and 2014.

22.     Due to his prior knowledge, training, education, and experience, Murphy readily familiarized himself with the process of perfecting and collecting asbestos personal injury trust fund claims for compensation after he was diagnosed with asbestosis.

23.     Between April 1, 2018, and November 1, 2020, Murphy personally located thirty asbestos personal injury trusts required to pay him compensation and filed more than twenty-five separate claims against such funds, invoking the individual review process for each, without assistance of counsel.

24.     Murphy specifically chose not to retain counsel in the asbestos personal injury trust fund claims process because he would be required to agree to pay a contingent attorney fee of forty percent to an attorney for perfecting his claims.

25.     Murphy concluded that he was capable, willing and then physically able to pursue his claims personally and successfully against the various asbestos

personal injury trusts liable to him and did not require the assistance of counsel in pursuing his claims.

26.    Conversely, after extensive research, several consultations with his treating physicians, and based upon his thirty-four years of experience in litigation, Murphy concluded that he could not prosecute a civil action without the assistance of counsel after November 1, 2020.

27.    Murphy's physical condition by the year 2020 had deteriorated to the point that he was physically unable to prosecute a civil action *pro* se against those entities responsible for his exposure to hazardous concentrations of asbestos fibers.

28.    Over time the progressive nature of his ARD and its sequelae rendered Murphy physically incapable of trying a civil action *pro* se of the length and complexity of an action against those entities responsible for Murphy' exposure to hazardous concentrations of asbestos fibers.

29.    Prosecuting a civil action against those entities responsible for Murphy's exposure to hazardous concentrations of asbestos fibers *pro se* in Murphy's choice of venue (the Central District of California) would have been and remains prohibitively expensive.

30.    Transportation to and from that venue, and lodging in that venue while prosecuting a civil action *pro se,* would have been and remains prohibitively expensive.

6

31.    The investigation, preparation and prosecution of a civil action regarding his exposure to asbestos *pro se* would have created an independent and substantial health risk due to Murphy's extraordinary oxygen requirements (he is currently prescribed continuous supplemental oxygen at eight liters per minute exertional delivered by concentrator).

32.    Prior to November 1, 2020, Murphy had successfully perfected his claims against and received the maximum amount of compensation available to him from four asbestos personal injury trusts by way of the individual review process.

33.    Prior to November 1, 2020, Murphy had also successfully arbitrated two asbestos trust fund claims when he believed the compensation offered during the individual review process inadequate and had received amounts greater than the maximum amount of compensation normally available to claimants from each of those funds.

34.    On or about October 30, 2020, Murphy received an advertising mailer from VLO in the United States mails, addressed to him at his home address in Michigan, and directly soliciting Murphy's retention of VLO as his attorneys. See Exhibit 2, *Vinson Mailers.*

35.    VLO has transmitted more than twenty-five similar advertising mailers, and  Murphy has subsequently received dozens of similar advertising mailers from VLO, at his home address in Michigan, directly soliciting business from those

7

addressees who were Navy veterans and exposed to asbestos during their military careers. Exhibit 2.

36.     In each of those mailers, VLO claimed to have "received 2 multi-million-dollar verdicts." *Id.*

37.     On October 30, 2020, Murphy, after reading the VLO advertising mailer he received in October, reviewed the information published on the VLO website, found at www.vinsonlaw.com. Exhibit 3.[1]

38.      VLO claimed, on its website and to solicit business, that:

"Our mission is to make whole those who have had their health, livelihood, and emotional well-being taken from them by a personal injury. We listen and then we fight. We feel humbled to represent our clients when they need us the most, and we work diligently and aggressively to make sure they obtain all possible justice under the law." Exhibit 3, at 2.

39.     The statements described in paragraph 38 were material and false; VLO neither was diligent nor aggressive in prosecuting the civil action on Murphy's behalf nor made "sure [Murphy] obtain[ed] all possible justice under the law".

40.     In fact, VLO and its agents (Vinson and Cagle) intentionally deprived Murphy of an opportunity to obtain "all possible justice under the law" when VLO

---

[1] Exhibit 3 is the Vinson Law Office webpage recorded by the Internet Archive (web.archive.org), the only site at which this writer could access a VLO website prior to November 2, 2020. Unfortunately, Exhibit 3 (the last troll by the Archive prior to November, 2020) is apparently incomplete and/or corrupted. The contents that are referenced in the Complaint do appear in Exhibit 3.

and its agents deprived Murphy of obtaining *any* justice from thirty-three named defendants in Murphy's civil action by preparing and entering a dismissal of all claims without Murphy's consent and contrary to his explicit instruction to NOT dismiss those claims. Exhibit 14.

41.    On its website, VLO misrepresented in conspicuous, bold print that VLO had recently "secured a $2 million-dollar (sic) verdict for the spouse of a client" below a large red caption stating "$2 Million Mesothelioma Verdict". Exhibit 3, at page 6.

42.    In a separate section of the website, on a page captioned BEN A. VINSON, JR., VLO made the following misrepresentations:

> In 2019, Attorneys Ben and co-counsel Mark Alonzo won a multimillion-dollar mesothelioma verdict in downtown Philadelphia, Pennsylvania. With the help of the firm's head Asbestos Paralegal, Lauren Zoons, they were able to receive a 2-million-dollar verdict in favor of Mrs. Sylvia Holder, widow of deceased Navy Machinist Mate Mr. Ernest Holder.

Exhibit 3, at 5.

43.    In a separate section of the website, on a page captioned MARK. ALONZO, VLO made the following misrepresentations:

> In 2019, Attorneys Ben and co-counsel Mark Alonzo won a multimillion-dollar mesothelioma verdict in downtown Philadelphia, Pennsylvania. With the help of the firm's head Asbestos Paralegal, Lauren Zoons, they were able to receive a 2-million-dollar verdict in favor of Mrs. Sylvia Holder, widow of deceased Navy Machinist Mate Mr. Ernest Holder.

Exhibit 3, at 6.

44.   VLO also published that misrepresentation in substance in a press release to Facebook on September 13, 2019. Exhibit 4, at 2.

45.   The representations described in paragraphs 41, 42, 43 and 44 were material, were intended to mislead and were utterly false; the actual gross recovery by Sylvia Holder was $120,000. Exhibit 4, Exhibit 5.

46.   On or about November 2, 2020, Murphy sent Vinson a brief factual summary of his history of exposure to hazardous concentrations of asbestos fibers during his naval service as well as his complete medical records, by email message to Ben@vinsonlegal.com. Exhibit 6. *email,* Murphy to Vinson, November 2, 2019.

47.   In that message, Murphy stated in substance that he wished to retain VLO to file and prosecute a civil action against those entities responsible for Murphy's exposure to hazardous concentrations of asbestos fibers. *Id.*

48.   Murphy did not originally intend to retain VLO to represent him in the asbestos personal injury trust fund claims process, since he had already initiated, demonstrated his capability to, and was in the continuing process of, pursuing those claims successfully without the assistance of counsel.

49.   On November 5, 2020, at about 11:30 a.m., Vinson contacted Murphy by telephone from (813)777-8015, seeking to discuss Murphy's claims and to persuade Murphy to retain VLO in pursuing those claims.

50.     When Vinson initiated the call, he knew that Murphy had been employed as a criminal and civil trial attorney for over thirty years and acknowledged that fact during the call. Exhibit 6, at page 2; Exhibit 7, at page 2.

51.     During the November 5, 2020, conversation, which lasted thirty minutes, Vinson repeatedly stated in substance that he had many years of experience in "successfully litigating asbestosis cases" on behalf of veterans.

52.     The statement described in the preceding paragraph was material and utterly false; Vinson has tried only four cases where damages were sought due to ARD since the year 2012 and had not tried a single asbestosis case.

53.     During the conversation, Vinson told Murphy, by way of example, that in 2019 VLO had "gotten a two-million-dollar verdict in an asbestos case".

54.     The statement described in the preceding paragraph was material and false; VLO had never obtained the verdict claimed. Exhibit 5.

55.     During the conversation, Vinson stated that he was "really interested" in pursuing Murphy's asbestos trust fund claims, which Vinson described as "low–hanging fruit" that Murphy had already described as "child's play".

56.     Murphy responded by stating in substance that he was willing to and demonstrably capable of perfecting his remaining asbestos personal injury trust fund claims (which he characterized as "child's play") without retaining VLO as counsel and that he was unwilling to pay the standard forty percent contingency fee when he

need not.

57.     Murphy explicitly informed Vinson that his purpose in contacting Vinson was to seek representation by VLO in *civil litigation*, and more specifically, to "file and prosecute a *civil action* sounding in product liability against the asbestos manufacturers, distributors, suppliers, and bare metal manufacturers potentially liable for Murphy's exposure to hazardous concentrations of asbestos" in the California courts.

58.     Vinson replied in substance that VLO's representation of Murphy "in civil litigation" against the asbestos manufacturers, distributors, suppliers, and bare metal manufacturers potentially liable for Murphy's exposure to hazardous concentrations of asbestos was "necessarily conditioned upon" VLO representation of Murphy in perfecting and collecting the asbestos personal injury trust fund claims.

59.     Vinson repeatedly emphasized throughout the call that any VLO agreement to "represent Murphy in civil litigation" or "file and prosecute a civil action against the asbestos manufacturers, distributors, suppliers, and bare metal manufacturers potentially liable for Murphy's exposure to hazardous concentrations of asbestos fibers" "***required***" that VLO represent Murphy in perfecting and collecting on the asbestos personal injury trust fund claims as well.

60.     Vinson then told Murphy that if he wished to retain VLO to "represent him in civil litigation", he must first withdraw his pending asbestos personal injury

12

trust fund claims and allow VLO to pursue those claims on his behalf.

61.     Vinson then told Murphy that it was in his best interest that VLO represent him in pursuing both the trust fund claims and litigation claims.

62.     The statement described in the preceding paragraph was material and false; given the knowledge, statements, and subsequent conduct of the defendants, VLO had no intention of prosecuting the civil action on Murphy's behalf, and VLO knew that Murphy could effectively perfect and collect his trust fund claims without counsel.

63.     Vinson then stated that VLO had many years of experience in "trying asbestosis cases" and that VLO had substantial success in "trying good ones."

64.     The statements described in the preceding paragraph were material and false; VLO has been in business since 2012, and VLO lawyers had tried only four cases involving ARD, none of which involved asbestosis.

65.     Vinson then stated that VLO sought to "try good asbestosis cases" because those asbestosis cases were "undervalued" and VLO sought to establish higher settlement values in future cases by obtaining substantial verdicts.

66.     The statements described in the preceding paragraph were material and false; VLO has been in business since 2012, its attorneys had tried only four cases involving ARD, and its attorneys had not tried a single asbestosis case.

67.     On November 3, 2020, Murphy thoroughly investigated his eligibility for

compensation from the various asbestos personal injury trust funds potentially liable to him and concluded that he qualified to receive compensation from more than thirty asbestos trust funds in an aggregate amount exceeding One Hundred Seventy-Five Thousand Dollars.

68.    Based upon the statements made on the VLO website, in the Facebook press release, in the VLO mailer of October, 2020, and the statements made by Vinson on November 5, 2020, Murphy agreed that VLO would represent Murphy in pursuing his remaining compensable asbestos personal injury trust fund claims if in exchange VLO would "represent Murphy in civil litigation" and "file and prosecute a civil action sounding in product liability against the asbestos manufacturers, distributors, suppliers, and bare metal manufacturers potentially liable for Murphy's exposure to hazardous concentrations of asbestos". Exhibit 7.

69.    VLO's website, in speaking to the term "civil litigation", states:

Litigation is the process of preparing a case for trial, and if a settlement cannot be reached, presenting the case at trial and handling appeals. Litigators develop the best legal theories in support of their client's case, gather the relevant documents and facts through discovery requests and depositions, and research and draft pretrial motions. If the case is not settled or dismissed, it proceeds to trial. At trial, litigators select the jury, make opening and closing statements, introduce exhibits, examine and cross-examine witnesses, and make and/or renew objections to preserve the record for appeal.

70.    At Vinson's instruction, Murphy then prepared and transmitted fifteen Notices of Withdrawal of his pending asbestos trust funds claims to Vinson at

Ben@vinsonlegal.com and Murphy formally agreed that VLO represent him in the asbestos claims process and pursue his asbestos trust fund claims on a forty percent contingent fee basis. Exhibit 7.

71.     Between November 9, 2019, and December 18, 2019, VLO investigated Murphy's eligibility to be compensated by various asbestos personal injury trust funds and concluded that Murphy was eligible to receive compensation from more than twenty-five asbestos trust funds in an aggregate amount exceeding One Hundred Fifty Thousand Dollars.

72.     On December 18, 2020, Zack Porter, an authorized agent and then an employee of VLO, contacted Murphy by telephone at 3:31 p.m. from (813)839 5708, and informed Murphy that "you did in fact qualify for compensation of around One Hundred Fifty Thousand". Only then did VLO agree to and send to Murphy a "new client package" containing the form Florida contingency fee agreement.

73.     Before being allowed to represent Murphy in a civil action on a contingency fee basis, VLO was also required to enter into the contingency fee agreement mandated by Florida law; on December 29, 2020, Vinson and Murphy signed that contingency fee agreement. Exhibit 8.

74.     On April 19, 2021, Paige Wojdyla, the VLO attorney who originally appeared on Murphy's behalf in the Illinois civil action, transmitted the email message attached as Exhibit 9 to Murphy.

75.    On March 17, 2022, Murphy, Vinson, and Defendant ZANE T. CAGLE. signed a contingency fee agreement. Exhibit 10.

76.    VLO has received more than Sixty-Five Thousand Dollars in "contingent"[2] fees while perfecting and collecting on Murphy's asbestos personal injury trust funds claims.

77.    On February 4, 2021, VLO, through an authorized agent, filed a civil action on Murphy's behalf against thirty-eight defendants claiming that those entities were asbestos manufacturers, distributors, suppliers, and bare metal manufacturers whose asbestos Murphy was exposed to, and that each was liable to Murphy in damages. Exhibits 10, 11.

78.    That action was captioned *Murphy v. Air and Liquid Supply, Inc., Et Al,* Case No. 21-L-0113, and was filed in the Twentieth Judicial Circuit Court of St. Clair County, Illinois. Exhibits 11, 12.

79.    On or about March 25, 2022, at 3:24 p.m., Defendant MARK A. ALONZO contacted Murphy by telephone from (813)839-5708 to convey a settlement offer made by one of the thirty-eight defendants in the civil action.

80.    Alonzo and Murphy spoke without interruption for more than forty

---

[2] The consideration was contingent in name only. Payment depended upon the collection of compensation from various trust funds, a certainty that VLO valued at about Sixty Thousand Dollars and Murphy valued at Sixty-Eight Thousand Dollars in fees at the outset.

minutes on that date.

81.    During the conversation, Alonzo informed Murphy that a defendant in the civil action had offered to settle Murphy's claims against it for Ten Thousand Dollars.

82.    Murphy had prolonged, regular, and substantial exposure to hazardous concentrations of asbestos fibers while working with that defendant's products during his naval service.

83.    Murphy had provided plenary evidence to VLO before the settlement offer was made regarding his exposure to that defendant's products, and that undisputed evidence demonstrated that Murphy's exposure was prolonged, regular, and substantial.

84.    During the conversation, Murphy informed Alonzo that he was unwilling to accept that amount in settlement of his claims against that defendant, because the offer was far less than nuisance value, did not approximate even five percent of what Murphy estimated his damages to be, and because that defendant's liability was clear.

85.    Murphy then asked Alonzo what, in his professional opinion and based on his experience, he estimated Murphy's potential damages to be from the defendant making the offer.

86.    Alonzo refused to approximate Murphy's potential damages against the

defendant making the offer.

87.     Murphy then asked Alonzo what, in his professional opinion and based on his experience, he estimated Murphy's potential damages to be from the named defendants, in total.

88.     Alonzo refused to approximate Murphy's potential damages against the named defendants.

89.     Murphy then asked Alonzo whether it was likely that Murphy would prevail at trial against one or more of the named defendants.

90.     Alonzo ignored the question, instead stating to Murphy (for the first time) that the VLO "litigation plan" was to try Murphy's case against one or two (at most) "target defendants" and to settle claims against the thirty-six remaining defendants for the highest amounts those defendants would offer.

91.     The statements described in the preceding paragraph were material and utterly false; the knowledge, statements, and actions of the defendants demonstrate that VLO never intended to litigate or to prosecute Murphy's civil action to verdict against *any* named defendant.

92.     When Murphy asked Alonzo to explain the VLO "litigation plan" in more detail, Alonzo informed Murphy that the VLO plan was a cost–driven necessity; because of the complex nature of asbestosis civil litigation, the costs of litigating claims against any more than one or two of the thirty-eight defendants

would be prohibitive and would result in "diminishing returns".

93.     Alonzo further informed Murphy that VLO intended from the outset to try Murphy's case against only the "target defendant(s)" if VLO was unable to obtain acceptable settlement offers from those "target defendants", and that the "best case scenario" was to prosecute the case against a "single target defendant."

94.     The statements described in the preceding paragraph were material and utterly false; the knowledge, statements, and actions of the defendants demonstrate that VLO did not intend to prosecute the civil action when VLO first agreed to do so.

95.     Murphy responded to those misrepresentations by informing Alonzo that he accepted Alonzo's recommendation that Murphy settle his claims against the defendant which had made the offer, if *but only if* accepting the offer would ensure that his case could be litigated and prosecuted (if necessary) against one or two "target defendants."

96.     Alonzo responded, "that's the plan."

97.     The statement described in the preceding paragraph was material and utterly false; that wasn't defendants' plan at all, and the knowledge, statements, and actions of the defendants demonstrate that VLO did not intend to prosecute the civil action at the time VLO agreed to do so.

98.     Murphy then asked Alonzo what results the "litigation plan" had

brought in the past, and Alonzo stated that VLO had recently "won a two-million-dollar verdict against John Crane, . . .the only defendant".

99.    The statement described in the preceding paragraph was intended to mislead Murphy and was utterly false; VLO had not won such a verdict. Exhibit 4; Exhibit 5.

100.    Murphy, based upon Alonzo's statements and the representations made by VLO and Vinson previously described, approved acceptance of the nuisance settlement offer and ended the phone call.

101.    Based upon Alonzo's statements and the representations made by VLO and Vinson previously described, Murphy subsequently approved (albeit after the fact) acceptance of four settlement offers, each for far less than nuisance value, in order to help finance litigation in the civil action.

102.    Had Alonzo not assured Murphy that such settlements would ensure the litigation and the prosecution of Murphy's claims against the target defendants, if necessary, Murphy would not have accepted any of the offers.

103.    Between February 4, 2021, (the date of filing of the civil action), and August 15, 2023, (when all claims were dismissed), VLO did not make a written settlement demand of any of the thirty-three named defendants and there is no record showing that any oral settlement demands were made.

104.    VLO neither utilized the discovery process nor obtained a schedule for

completion of discovery nor had Murphy's case set for trial, despite a readily available method of doing so through a "case management order." Exhibit 13.

105.   Murphy, between May 1, 2021, and August 15, 2023, made repeated inquiry of the agents and employees of VLO as to whether a case management order had been entered, and his case set for trial, but received no response.

106.   Murphy, between September 1, 2021, and August 15, 2023, repeatedly instructed the agents and employees of VLO to have his case set for trial but Murphy received no response.

107.   VLO neither received nor requested signed answers to interrogatories from any defendant during the civil action.

108.   VLO neither received nor requested signed responses to requests for production of documents from any asbestos defendant during the civil action.

109.   VLO neither received nor requested signed responses to requests for admissions from any asbestos defendant during the civil action.

110.   VLO neither requested, nor scheduled, nor conducted discovery depositions of any fact witnesses to be called by the asbestos defendants at trial.

111.   VLO neither requested nor received formal disclosures or the identity of corporate, fact or site witnesses to be called by the asbestos defendants at trial.

112.   VLO neither requested nor received formal disclosures of the general and case specific expert witnesses to be called by the asbestos defendants at trial.

113.   VLO never conducted discovery depositions of any expert witnesses to be called by the asbestos defendants at trial.

114.   Instead, VLO settled five of the thirty-eight separate claims in *Murphy v. Air & Liquid Supply, Inc., Et Al*, each for less than its nuisance value and for far less than Murphy's compensable damages, before abandoning the remainder on August 15, 2023.

115.   Murphy was not consulted about the five offers VLO accepted before VLO did so, and VLO accepted the first offer made in each instance.

116.   VLO surreptitiously arranged, with Defendant ZANE CAGLE's active advice and assistance, to dismiss the remaining thirty-three claims, without Murphy's consent and in direct contravention to his instructions to set the case for trial.

117.   On August 14, 2023, at 12:07 p.m., Vinson called Murphy by telephone from (813)777-8015, seeking to discuss the "settlement" of what Vinson described as "the claims against the single remaining defendant".

118.   Vinson did not mention and refused to acknowledge the fact that there were then thirty-two other claims pending.

119.   During the August 14, 2023, conversation, which lasted thirty-three minutes, Vinson stated in substance that given the risks involved it was in Murphy's "best interests" to settle his claims by dismissal of all claims against "the single

remaining defendant".

120.    The two representations made by Vinson described in the preceding paragraph were material, were intended to mislead Murphy and were utterly false.

121.    VLO certainly perceived that settlement was in *its* best interest, because VLO's financial risk in litigating the civil action was substantial, far exceeding One Hundred Fifty Thousand Dollars.

122.    VLO would be required to pay the costs, both taxable and untaxable, of prosecuting the civil action to verdict if a jury returned a verdict of no cause for action. Exhibit 8, at page 4, ¶¶ 8, 9.

123.    Given the laws on allocation of fault that would apply at trial, VLO faced an additional substantial financial risk, in that the trier of fact could return a multimillion-dollar verdict and VLO could still suffer a substantial financial net loss. See, e.g., Exhibits 4, 5.

124.    Vinson's false and repeated representation that Murphy had a single remaining claim against only John Crane, Inc. on August 14, 2023, was intended to create a false "one and only chance" scenario.

125.    Murphy told Vinson in no uncertain terms that according to the court docket, there were claims by Murphy pending against more than thirty defendants and Murphy had been informed of and agreed to dismissal of his claims against only five defendants. Exhibit 12.

126. Vinson falsely repeated that there was only one remaining defendant, when in fact there were at least thirty-three. Exhibit 12.

127. During the August 14, 2023, conversation, Murphy pressed Vinson for an explanation for the inexplicable recommendation that Murphy dismiss all claims against the remaining thirty-three defendants.

128. Vinson repeatedly offered a single false explanation - that Murphy's risks in prosecuting his claims outweighed any potential reward he would obtain at trial.

129. The statement described in the preceding paragraph was material and utterly false for the reasons stated in Paragraphs 121 through 123, as well as for another reasons of which Vinson and Alonzo were personally aware of and specifically advised of – that Murphy was uncollectable.

130. Murphy then asked Vinson to approximate the potential damages he could anticipate if Murphy prevailed at trial.

131. Vinson refused to make an approximation of any potential damage award.

132. Murphy then asked Vinson what the risks of prosecuting the case against "the single remaining defendant" were, and who the "single remaining defendant" was.

133. Vinson stated that the risk was that Murphy would lose at trial, and that

24

the remaining defendant was John Crane, Inc. (JCI).

134.   VLO had previously assured Murphy that JCI would not be a "target defendant" and would be dismissed in the early stages of the civil action. Exhibit 9.

135.   Vinson further stated that JCI was universally known as a "no pay" defendant in asbestos litigation; that term denotes that JCI does not settle asbestos claims against it regardless of the merits of the claim and litigates each claim against it through to jury verdict. Exhibit 4.

136.   VLO knew of the reputation of JCI as a "no pay" defendant in asbestos litigation when VLO first drafted the complaint and caused the civil action to be filed. Exhibit 4; Exhibit 9.

137.   VLO did not intend to prosecute Murphy's claims against JCI when VLO named JCI as a defendant in Murphy's civil action. Exhibit 9.

138.   VLO named JCI as a defendant solely to establish jurisdiction and venue in St. Clair County, Illinois, where JCI has its principal place of business. *Id*.

139.   VLO intended to dismiss Murphy's claims against JCI prior to trial at the time VLO drafted and filed Murphy's complaint. *Id*.

140.   Murphy repeatedly, specifically and unequivocally informed Vinson that he was willing to accept the risk of losing at trial and repeatedly informed Vinson that no defendant would be able to recover any costs from Murphy.

141.   Vinson stated that there was an added risk that, if a jury found against

him, Murphy could lose all the money he had recovered from pursuing his asbestos claims, to which Murphy responded, "[e]xcept I am uncollectible".

142.    The statement described in the preceding paragraph was material, was intended to mislead and intimidate Murphy and was utterly false, for the reasons stated in Paragraphs 121 through 123.

143.    Murphy again informed Vinson that he was willing to accept the risks described, that he rejected VLO's recommendation to dismiss all claims, and once again instructed Vinson to set the case for trial.

144.    Vinson refused and stated that if Murphy refused to agree to dismiss his remaining claims, VLO would move to withdraw as his attorneys.

145.    VLO did not have the right to refuse to set the case for trial, and did not have the right to withdraw from its representation of Murphy unless Murphy consented to its withdrawal, or the trial court approved a motion to withdraw properly noticed for hearing, heard and granted.

146.    Murphy informed Vinson that he needed to consult with his wife before making a final decision, but that he did not anticipate that he would accept Vinson's recommendation, and that he would inform Vinson of his final decision as soon as possible.

147.    After the telephone discussion conversation ended, without waiting for Murphy's final decision, Vinson contacted Zane T. Cagle, VLO's authorized agent

and local counsel whom VLO had hired to represent Murphy in the courts of the State of Illinois.

148.   Vinson informed Cagle of the substance of his conversation with Murphy and VLO's intention to file a motion to withdraw.

149.   Cagle, knowing that Vinson sought to end VLO's representation of Murphy and knowing that Murphy had not consented to withdrawal or dismissal of any claim(s), informed Vinson that Vinson need not obtain Murphy's consent to dismiss the "sole remaining defendant" (and the entirety of Murphy's claims) but could simply file a dismissal without prejudice, over Murphy's objection. Exhibit 14, Exhibit 15; Exhibit 16.

150.   On August 15, 2023, without Murphy's knowledge or consent, Cagle (acting with Vinson's full knowledge and at Vinson's instruction) filed a dismissal without prejudice of all claims. Exhibit 14, Exhibit 15, Exhibit 16.

151.   The dismissal purports to extinguish all claims, and in preparing and entering the dismissal, Cagle violated the fiduciary duties he owed to Murphy.

152.   The dismissal caused Murphy's claims against each and all named defendants to be extinguished on August 15, 2023. Exhibit 14; Exhibit 17.

153.   Just days prior to August 15, 2023, VLO had perfected the final asbestos trust fund claims from which Murphy qualified for compensation, and VLO could no longer pursue any compensable claims on Murphy's behalf and collect a

contingency fee.

154.   VLO has received and converted to its own use more than Sixty-Five Thousand Dollars in contingency fees and costs for representing Murphy in the asbestos trust fund claims process.

155.   VLO had received and converted to its own use more than Nineteen Thousand Dollars in contingency fees and costs for representing Murphy in the asbestos litigation process.

156.   On August 24, 2023, Murphy sent an email message to Cagle, at zane@caglellc.com requesting a copy of Murphy's entire client file. Exhibit 17.

157.   On the same day and about seven hours later, Cagle provided access to what Cagle described as Murphy's client file, but deliberately withheld access to portions of the file that Murphy was entitled to by failing to transmit letters, emails and messages received from co-counsel and defense counsel. Exhibit 17.

158.   On December 12, 2023, at 2:23 p.m., Murphy transmitted a written demand to VLO for the return of his entire client file as well as several books and several thousand pages of original documents in digital form that Murphy had obtained through hundreds of hours of research and had provided to VLO at its request. Exhibit 18.

159.   To this date, and despite repeated demands for Murphy's complete client file, several books and several thousand pages of original documents

referenced in the preceding paragraph be returned, VLO has failed to comply with Murphy's demands. Exhibit 17; Exhibit 18.

160.   On February 12, 2023, Murphy transmitted a written demand to VLO for return of Seventy-Four Thousand Dollars based upon Murphy's declaration that the agreement of the parties is void because the agreement was induced by fraud, and notified VLO that it is liable for treble damage pursuant to F.S.A. § 772.11(1) because VLO has withheld and converted those funds to its own use. Exhibit 19.

161.   On or before March 14, 2024, VLO established as firm policy that it would no longer accept and prosecute civil actions where damages are primarily based on the sequelae of asbestosis.

162.   VLO has failed and refused to return the funds and property demanded on February 12, 2024.

163.   On June 5, 2024, VLO mailed a self-styled "settlement statement and settlement draft" to Murphy at his home address in Michigan, falsely claiming and deducting Three Thousand Two Hundred Sixty-Three and 12/100 Dollars in costs from settlement funds VLO had received. Exhibit 20.

164.   In deducting Three Thousand Two Hundred Sixty-Three and 12/100 Dollars  in claimed costs from settlement funds VLO had received, VLO converted that amount of Murphy's personal property to its own use in violation of F. S. A. § 772.11(1).

165. On June 17, 2024, Murphy sent Ben A. Vinson, Jr. the letter attached as Exhibit 22.

166. On July 5, 2024, VLO mailed an amended self-styled settlement statement and settlement draft to Murphy at his home address in Michigan, claiming and deducting Seventy-Seven Dollars in costs from settlement funds VLO had received. Exhibit 23.

167. Murphy has complied with, and VLO has failed to comply with F. S. A. § 772.11(1).

168. Since dismissal of his claims, Murphy has suffered substantial reputational damage in the several veterans' communities in which he is active.

169. Once respected as knowledgeable in "all things asbestos" by his fellow veterans suffering from ARD, Murphy is now frequently referred to as "having been conned by his own lawyer" and is frequently ridiculed as "MAGA-man" (referencing the acronym Make Attorneys Get Attorneys).

170. Murphy is childless and he married his current wife on July 5, 2018.

171. Because he married after being diagnosed with asbestosis, Murphy's damages die with him and any delay in litigating the civil action causes him substantial prejudice.

172. The Defendants have intentionally, knowingly and maliciously created prejudicial delay between February 4, 2020, and August 23, 2023.

173. Because asbestosis is a progressive, chronic, and incurable form of pulmonary fibrosis, and in severe cases typically causes death within ten years of diagnosis, any delay in litigating the civil action does Murphy substantial prejudice.

174. Murphy was diagnosed on March 20, 2018, the sequelae of his asbestosis have dramatically worsened since diagnosis, and any delay in litigating the civil action does him substantial prejudice.

175. Justice delayed in this case is truly justice denied.

**FIRST CAUSE OF ACTION:**
**FRAUDULENT INDUCEMENT**
**(VINSON LAW OFFICE PA, AND BEN A VINSON, JR.)**

176. Murphy adopts by reference the preceding paragraphs pursuant to F. R. Civ. P. 10(c).

177. The many material misrepresentations made by Vinson to Murphy prior to January 1, 2020, and described in the preceding paragraphs, were false.

178. The many material misrepresentations made by Vinson to Murphy prior to January 1, 2020, described in the preceding paragraphs, constitute intentional misconduct within the meaning of F. S. A. § 768.72(2).

179. The many material misrepresentations made by Vinson to Murphy prior to January 1, 2020, described in those preceding paragraphs were made recklessly and were so wanting in care that Vinson's conduct constitutes gross negligence within the meaning of F. S. A. § 768.72(2).

180. Because Vinson is an officer of VLO, VLO is liable for punitive damages pursuant to F. S. A. § 768.72(3).

181. Defendant Vinson, acting on behalf of Defendant VLO, made the misrepresentations described prior to January 1, 2020, intending Murphy to rely and act upon those misrepresentations by entering into the agreement described and for Murphy to continue to honor that agreement until VLO had completely collected all available compensation Murphy had agreed to pay.

182. Murphy relied on Vinson's misrepresentations made prior to January 1, 2020, and his reliance was objectively justified.

183. As a direct, proximate, and foreseeable result of Vinson's misrepresentations made prior to January 1, 2020, Murphy has suffered economic loss exceeding Seventy-Five Thousand Dollars, including "contingent fees" collected by VLO and the continuing expenses incurred in obtaining psychological care and treatment.

184. As a direct, proximate, and foreseeable result of Vinson's actions and statements, Murphy has suffered emotional distress, mental anguish, humiliation, reputational damage, embarrassment, loss of enjoyment of life and has been required to seek out and obtain continuing psychological treatment and care for such harms.

**WHEREFORE**, Murphy prays for judgment against the Defendants BEN J. VINSON, JR., and VINSON LAW OFFICE PA, jointly and severally, for actual,

consequential, and punitive damages in the amount found by the trier of fact, together with costs and interest.

### SECOND CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION
### (DEFENDANTS VINSON LAW OFFICE, BEN VINSON)

185.   Murphy adopts by reference the preceding paragraphs pursuant to F. R. Civ. P. 10(c).

186.   The many misrepresentations made to Murphy by Vinson on and after August 14, 2023, and described in the preceding paragraphs were false and material misrepresentations.

187.   The many misrepresentations made to Murphy by Vinson on and after August 14, 2023, described in the preceding paragraphs were made falsely and intentionally and therefore constitute intentional misconduct within the meaning of F. S. A. § 768.72(2).

188.   The misrepresentations made to Murphy by Vinson on and after August 14, 2023, described in the preceding paragraphs, were made so recklessly and were so wanting in care that Vinson's conduct constitutes gross negligence within the meaning of F. S. A. § 768.72(2).

189.   Because Vinson is an officer of VLO, VLO is liable for punitive damages pursuant to F. S. A. § 768.72(3).

190.   Defendant Vinson, acting on behalf of Defendant VLO, made those

33

misrepresentations intending Murphy to rely and act upon those misrepresentations by continuing to honor the parties' agreement after March 25, 2022.

191.   Murphy justifiably relied upon the material misrepresentations he has described by continuing to honor the parties' agreement after March 25, 2022.

192.   As a direct, proximate, and foreseeable result of the actions and statements of Vinson, Murphy has suffered economic loss more than Seventy-Five Thousand Dollars, including "contingent fees" collected by VLO and the continuing expenses incurred in obtaining psychological care and treatment on a weekly basis.

193.   As a direct, proximate, and foreseeable result of Vinson's actions and statements, Murphy has suffered emotional distress, mental anguish, humiliation, reputational damage, embarrassment, and loss of enjoyment of life and has been required to seek out and obtain continuing psychological treatment and care for such harms.

**WHEREFORE**, Murphy prays for judgment against Defendants BEN A. VINSON and VINSON LAW OFFICE PA, jointly and severally, for actual, consequential, and punitive damages in the amount found by the trier of fact, together with costs and interest.

### THIRD CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION
### (DEFENDANTS VINSON LAW OFFICE PA, MARK A. ALONZO)

194.   Murphy adopts by reference the preceding paragraphs pursuant to F. R.

Civ. P. 10(c).

195.    The many misrepresentations made to Murphy by Alonzo described in the preceding paragraphs were false and material misrepresentations.

196.    The misrepresentations made to Murphy by Alonzo described in the preceding paragraphs were made falsely and intentionally and constitute intentional misconduct within the meaning of F. S. A. § 768.72(2).

197.    The misrepresentations made to Murphy by Alonzo described in the preceding paragraphs were made so recklessly and were so wanting in care that Alonzo's conduct constitutes gross negligence within the meaning of F. S. A. § 768.72(2).

198.    Because Alonzo is an officer of VLO, VLO is liable for punitive damages pursuant to F. S. A. § 768.72(3).

199.    Defendant Alonzo, acting on behalf of Defendant VLO, made those misrepresentations intending Murphy to rely and act upon those misrepresentations by continuing to honor the parties' agreement after March 25, 2022.

200.    Murphy justifiably relied upon the material misrepresentations he has described by continuing to honor that agreement after March 25, 2022.

201.    As a direct, proximate, and foreseeable result of the actions and statements of Alonzo, Murphy has suffered economic loss exceeding Seventy-Five Thousand Dollars, including "contingent fees" collected by VLO and the continuing

expenses incurred in obtaining psychological care and treatment.

202.   As a direct, proximate, and foreseeable result of the actions and statements of Alonzo, Murphy has suffered emotional distress, mental anguish, humiliation, reputational damage, embarrassment, and loss of enjoyment of life and has been required to seek out and obtain continuing psychological treatment and care for such harms.

**WHEREFORE**, Murphy prays for judgment against Defendants MARK A. ALONZO and VINSON LAW OFFICE PA, jointly and severally, for actual, consequential, and punitive damages in the amount found by the trier of fact, together with costs and interest.

### FOURTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
### (VINSON LAW OFFICE PA, BEN A. VINSON, JR., MARK A. ALONZO)

203.   Murphy adopts by reference the preceding paragraphs pursuant to F. R. Civ. P. 10(c).

204.   Vinson and Alonzo made the many misrepresentations to Murphy described in the preceding paragraphs while acting as agents of VLO.

205.   The many misrepresentations described were false and material misrepresentations.

206.   The material misrepresentations made to Murphy by Vinson and Alonzo described in the preceding paragraphs were made negligently, in that Vinson

and Alonzo knew or should have known the representations were false.

207.   Vinson and Alonzo, acting on behalf of VLO, made those misrepresentations intending Murphy to rely and act upon those misrepresentations by entering into the agreement described in Exhibits 2, 3 and 4 and in continuing to honor that agreement after March 25, 2022.

208.   Murphy justifiably relied upon the material misrepresentations he has described in entering into the agreement described and in continuing to honor that agreement after March 25, 2022.

209.   As a direct, proximate, and foreseeable result of the actions and statements of Vinson and Alonzo, Murphy has suffered economic losses of more than Seventy-Five Thousand Dollars, including "contingent fees" collected by VLO and the continuing expenses incurred in obtaining psychological care and treatment.

210.   As a direct, proximate, and foreseeable result of the actions and statements of Vinson and Alonzo, Murphy has suffered emotional distress, mental anguish, humiliation, reputational damage, embarrassment, and loss of enjoyment of life and has been required to seek out and obtain continuing psychological treatment and care for such harms.

**WHEREFORE**, Murphy prays for judgment against Defendants BEN A. VINSON, JR., MARK A. ALONZO and VINSON LAW OFFICE PA, jointly and severally, for actual, consequential, and exemplary damages in the amount found by

the trier of fact, together with costs and interest.

### FIFTH CAUSE OF ACTION
### CONSPIRACY TO DEFRAUD
### (VINSON LAW OFFICE, PA AND ZANE T. CAGLE)

211.   Murphy adopts by reference the preceding paragraphs pursuant to F. R. Civ. P. 10(c).

212.   Vinson and Alonzo, acting in concert and on behalf of VLO, concocted a scheme to defraud Murphy by persuading Murphy to retain VLO in pursuing his trust fund claims (and receive forty percent of any proceeds), by representing that VLO would file and prosecute the claims Murphy could make in the civil action described, when VLO never intended to prosecute those claims.

213.   Vinson acted in furtherance of that scheme by his statements and actions as described in the preceding paragraphs.

214.   Alonzo acted in the furtherance of that scheme by his statements and actions as described in the preceding paragraphs.

215.   Cagle later joined the scheme to defraud on an unknown date in 2022 and acted in furtherance of the scheme by his actions as described in the preceding paragraphs.

216.   The statements and actions of Vinson, Alonzo and Cagle on behalf of VLO described in the preceding paragraphs constitutes intentional misconduct within the meaning of F. S. A. § 768.72(2).

217.   The statement and actions of Vinson, Alonzo and Cagle on behalf of VLO described in the preceding paragraphs was so reckless and so wanting in care that such conduct constitutes gross negligence within the meaning of F. S. A. § 768.72(2).

218.   Because Vinson and Alonzo are officers of VLO, VLO is liable for punitive damages pursuant to F. S. A. § 768.72(3).

219.   As a direct, proximate, and foreseeable result of the actions and statements of Vinson, Alonzo and Cagle, Murphy has suffered economic losses of more than Seventy-Five Thousand Dollars, including "contingent fees" collected by VLO and the continuing expenses incurred in obtaining psychological care and treatment.

220.   As a direct, proximate, and foreseeable result of the actions and statements of Vinson, Alonzo and Cagle described, Murphy has suffered emotional distress, mental anguish, humiliation, reputational damage, embarrassment, and loss of enjoyment of life and has been required to seek out and obtain continuing psychological treatment and care for such harms.

**WHEREFORE**, Murphy prays for judgment against Defendants VINSON LAW OFFICE, PA, and ZANE T. CAGLE jointly and severally, for his actual, consequential, and punitive damages in the amount found by the trier of fact, together with costs and interest.

## SIXTH CAUSE OF ACTION
## STATUTORY CONVERSION
## (VINSON LAW OFFICE, PA)

221.   Murphy adopts by reference the preceding paragraphs pursuant to F. R. Civ. P. 10(c).

222.   VLO converted Murphy's personal property to its own use when VLO retained approximately Seventy-Nine Thousand Dollars in contingent fees and costs; VLO withheld that amount from settlement drafts satisfying Murphy's claims and retained those funds, in violation of F. S. A. § 7721.11(1).

223.   VLO converted Murphy's personal property to its own use when VLO refused to return several books including legacy 1966 and 1967 "WestPac Cruise Books" and three (3) volumes of *The Ultimate Cruise, U.S.S. Frank E. Evans (DD–754)* dating through 1968, and thousands of pages of case-related documents Murphy gathered and transmitted to VLO.

224.   On January 5, Murphy transmitted a written demand for the return of his personal property to VLO, and VLO has not returned that personal property.

225.   On February 12, 2023, Murphy transmitted a written demand to VLO for return of Seventy-Four Thousand Dollars based upon Murphy's declaration that the agreement of the parties is void because the agreement was induced by fraud, and notified VLO that it is liable for treble damage because VLO has withheld and converted those funds to its own use, pursuant to F. S. A. § 7721.11(1).

40

226.  The conduct of VLO in converting Murphy's property to its own use constitutes intentional misconduct within the meaning of F. S. A. § 768.72(2), and VSO is therefore liable for punitive damages pursuant to F.S.A. § 768.72(3).

227.  Murphy has suffered the economic damages described as a direct, proximate, and foreseeable result of the conversions of property described in the preceding paragraphs and is entitled to treble damages pursuant to F. S. A. § 7721.11(1).

**WHEREFORE**, Murphy prays for judgment against Defendant VINSON LAW OFFICE, PA for treble damages pursuant to F. S. A. § 7721.11(1), in an amount more than Two Hundred Twenty-Five Thousand Dollars, together with costs and interest.

### SEVENTH CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTIES
### (VINSON LAW OFFICE, PA, BEN A VINSON, JR., MARK A. ALONZO AND ZANE T. CAGLE)

228.  Murphy adopts by reference the preceding paragraphs pursuant to F. R. Civ. P. 10(c).

229.  Vinson, Alonzo, and Cagle each owed fiduciary duties to Murphy and were required to act in the utmost good faith in Murphy's best interest.

230.  Vinson, Alonzo, and Cagle each owed the fiduciary duties to Murphy to act with the utmost candor, rectitude, due care, loyalty, and good faith, and to make full and timely disclosure of all relevant information.

231.   Vinson, Alonzo, and Cagle each breached those fiduciary duties by the conduct described in the preceding paragraphs.

232.   The conduct of Vinson, Alonzo and Cagle described in the preceding paragraphs constitutes intentional misconduct within the meaning of F. S. A. § 768.72(2).

233.   The conduct of Vinson, Alonzo and Cagle described in the preceding paragraphs was so reckless and so wanting in care that such conduct constitutes gross negligence within the meaning of F. S. A. § 768.72(2).

234.   Because Vinson and Alonzo are officers of VLO, VLO is liable for punitive damages pursuant to F. S. A. § 768.72(3).

235.   As a direct, proximate, and foreseeable result of the breach of fiduciary duties described, Murphy has suffered economic loss exceeding Seventy-Five Thousand Dollars, including "contingent fees" collected by VLO and the continuing expenses incurred in obtaining psychological care and treatment.

236.   As a direct, proximate, and foreseeable result of the breach of fiduciary duties described, Murphy has suffered emotional distress, mental anguish, humiliation, reputational damage, embarrassment, an abiding sense of betrayal, loss of enjoyment of life, and has been required to seek out and obtain continuing psychological treatment and care for such harms.

**WHEREFORE**, Murphy prays for judgment against Defendants VINSON

LAW OFFICE, PA, BEN A. VINSON, JR., MARK A. ALONZO and ZANE T.

CAGLE, jointly and severally, for his consequential economic, noneconomic and

punitive damages, in the amount found by the trier of fact, together with costs and

interest.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.


Respectfully submitted,
/s/*Timothy Patrick Murphy*
TIMOTHY PATRICK MURPHY
Plaintiff Pro Se
41640 White Tail Lane
Canton, Michigan 48188-2073
313-318-0310
timothypmurphy@murphyslaw82.com

Dated: July 22, 2024.

**MURPHY V. VINSON LAW OFFICE, PA, ET AL,**
**CASE NO.**
**INDEX OF EXHIBITS**

| Exhibit | Brief Description |
|---------|-------------------|
| 1. | Excerpt, GAO Report No. 11-819, *Asbestos Injury Compensation* |
| 2. | Vinson Law Office Advertising Mailers to Navy Veterans (Issues 24-27)` |
| 3. | Vinson Law Office Webpage (trolled September 23, 2020) |
| 4. | Vinson Law Office Press Release on Facebook (September 13, 2020). |
| 5. | Docket entries, *Holder v. ABB, Inc., Et Al.* |
| 6. | Message (email) from Murphy to Vinson on November 2, 2020. |
| 7. | Emails, November 8-9, 2020, Vinson and Murphy, *Representation* |
| 8. | Contingency Fee Agreement of December 29, 2020. |
| 9. | Message (email) of April 19, 2021, Paige Wojdyla to Murphy. |
| 10. | Co-counsel (Contingency Fee) Agreement, Vinson Law and Cagle Law Firm. |
| 11. | Complaint in *Murphy v. Air & Liquid Supply, Inc., Et Al.* |
| 12. | Docket Entries, *Murphy v. Air & Liquid Supply, Inc., Et Al.* |
| 13. | Form Case Management Order. |
| 14. | Dismissal Without Prejudice, August 15, 2023. |
| 15. | Letter of August 21, 2023. |
| 16. | Letter of August 23, 2023. |
| 17. | Dialog (email) of August 24, 2023. |
| 18. | Letter of January 5, 2024. |
| 19. | Letter of February 14, 2024, . |
| 20. | Englander-Fischer Letter of March 13, 2024. |
| 21. | Settlement Statement and Settlement Draft Converting Funds. |
| 22. | Letter of June 17, 2024. |
| 23. | Amended Settlement Statement and Draft. |

**MURPHY V. VINSON LAW OFFICE, PA, ET AL,
CASE NO.**

**EXHIBIT  1**

GAO Report No. 11-819 (September 2011), *Asbestos Injury Compensation*.

# GAO

**United States Government Accountability Office**

Report to the Chairman, Committee on
the Judiciary, House of Representatives

September 2011

# ASBESTOS INJURY COMPENSATION

# The Role and Administration of Asbestos Trusts



U.S. Government Accountability Office



Highlights of GAO-11-819, a report to the Chairman, Committee on the Judiciary, House of Representatives

**September 2011**

# ASBESTOS INJURY COMPENSATION

## The Role and Administration of Asbestos Trusts

## Why GAO Did This Study

Asbestos litigation arose out of millions of Americans' lengthy occupational exposure to asbestos which is linked to malignant and nonmalignant diseases. To date, about 100 companies have declared bankruptcy at least partially due to asbestos-related liability. In accordance with Chapter 11 and § 524(g) of the federal bankruptcy code, a company may transfer its liabilities and certain assets to an asbestos personal injury trust, which is then responsible for compensating present and future claimants. Since 1988, 60 trusts have been established to pay claims with about $37 billion in total assets.

GAO was asked to examine asbestos trusts set up pursuant to § 524(g). This report addresses: (1) How much asbestos trusts have paid in claims and how trusts are administered, (2) How trust claim and payment information is made available to outside parties, and (3) Stakeholder—plaintiff and defense attorneys, trust officials, and other interested parties—views on whether more trust and claimant information should be made available to outside parties and efforts to change the trust system and processes. GAO analyzed trust agreements for 44 of 60 trusts and trust distribution procedures for 52 of 60 trusts, as well as financial reports for 47 of 60 trusts for 2009 and 2010. GAO also interviewed U.S. Bankruptcy Court judges and the trustees, general counsels, or directors from 11 trusts.

View GAO-11-819 or key components. For more information, contact William O. Jenkins, Jr., at (202) 512-8757 or jenkinswo@gao.gov.

## What GAO Found

From 1988 through 2010, GAO's analysis of available trust payment data show that trusts have paid about 3.3 million claims valued at about $17.5 billion and that each trust has trust distribution procedures (TDP) that govern its administration and establish the process for assessing and paying claims. Typically, TDPs include sections related to the intake and evaluation of claims, payment processes, and audit programs. Claims that meet the TDP's criteria for a particular disease are paid in the amount specified in the TDP.

Most asbestos trusts we reviewed publish for public review annual financial reports and generally include total number of claims received and paid. Other information in the possession of a trust, such as an individual's exposure to asbestos, is generally not available to outside parties but may be obtained, for example, in the course of litigation pursuant to a court-ordered subpoena. The 44 trust agreements GAO reviewed all required that trusts submit annual financial reports to the U.S. Bankruptcy Court of jurisdiction. Although TDPs typically provide that the trusts will make claim and payment information available to claimants and other parties, each trust ultimately determines what information it will make available. Of the 47 trust annual financial reports for 2009 and 2010 that GAO reviewed, all included the total amount of payments made and most included the total number of claims received and paid. One trust's financial report contained claimant names and amounts paid to these individuals. Of the 52 trust TDPs GAO reviewed, 33 (64 percent) included sections related to protecting the confidentiality of claimants' information and these sections often state that the trusts will only disclose information to outside parties with permission of the claimant or in response to a valid subpoena.

Views differ on whether more trust and claimant information should be made available and there have been efforts to change the trust system. Plaintiff attorneys and trusts oppose proposals that would require additional disclosure of claimant information, such as amounts paid to individual claimants, stating that such information is available to the defense through subpoenas and that disclosure otherwise could compromise the confidentiality of claimants' private information. Defense attorneys support additional disclosure, stating that such information could be used to offset asbestos defendants' settlements in court and reduce fraudulent claims. In recent years, there have been various proposals to require additional disclosure of claimant information. One of these proposals was recently brought before the Judicial Conference of the United States, the primary policy making body of the U.S. courts.

In commenting on a draft copy of this report, the Department of Justice and the Administrative Office of the U.S. Courts provided technical clarifications, which GAO incorporated where appropriate.

# Contents

Letter                                                                                            1

    Background                                                                 6
    Asbestos Trusts Have Paid at Least  $17 Billion in Claims and Are
      Administered in Accordance with Trust Distribution Procedures          16
    Most Asbestos Trusts Publish Annual Financial Reports Whose
      Details Vary; Parties May Obtain Other Information through
      Requests or Subpoenas                                                   24
    Views Differ on Whether Additional Claimant Information Should
      Be Made Available; Recent Efforts to Change the Trust System           29
    Agency Comments and Our Evaluation                                         34

Appendix I         Select Federal Legislative Proposals Addressing Compensation
      for Asbestos-Related Harms or Death                                     35

Appendix II        GAO Contact and Staff Acknowledgments                               40

Table              Table 1: Information Found in Trusts' 2009 and 2010 Annual
      Reports Obtained and Reviewed by GAO                                    25

Figures            Figure 1: Asbestos Mineral and Examples of Products That
      Contained Asbestos                                                       7
    Figure 2: Timeline of Events Surrounding the Establishment of
      Asbestos Trusts                                                         10
    Figure 3: Chapter 11 Bankruptcy Process through Which Asbestos
      Bankruptcy Trusts Are Created                                           12
    Figure 4: Overview of the U.S. Bankruptcy System                           14
    Figure 5: Asbestos Trust Claim Process                                     19
    Figure 6: Key Actors Involved In the Asbestos Bankruptcy Trust
      Payment Process                                                         22



This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.



**United States Government Accountability Office**
**Washington, DC 20548**

September 23, 2011

The Honorable Lamar Smith
Chairman
Committee on the Judiciary
House of Representatives

Dear Chairman Smith:

Asbestos litigation has been the longest-running mass tort litigation in U.S. history and arose out of millions of Americans' lengthy and widespread occupational exposure to asbestos, which has been linked to malignant and nonmalignant diseases.[1] Asbestos is a term used to describe naturally occurring silicate minerals that had wide industrial, commercial, and household usage in the United States during the 20th century because of its flame-retardant and insulating properties. Even with U.S. asbestos consumption peaking in 1973 and dropping over the next 3 decades, estimates of the number of individuals exposed to asbestos in the U.S. range from approximately 27 million to 100 million.

Asbestos-related diseases have a relatively long latency period, meaning it usually takes decades from the time of exposure to asbestos or asbestos-containing products and the date of medical diagnosis of asbestos-related disease or asbestos-related death. As early as 1900, asbestos was recognized as a cause of occupational disease—namely asbestosis, a nonmalignant respiratory disease characterized by scarring of the lung tissue that may progress to impairment and death. By 1960, the connection between asbestos and mesothelioma—a cancer of the lining of the lungs, chest, or abdomen that typically causes death within 1 or 2 years of diagnosis—was established.[2] Mesothelioma was not

---

[1]A tort is a civil wrong that results in an injury or harm and that is recognized by law as grounds for a lawsuit by the injured party; a mass tort is one that injures many people. The primary aim of tort law has been described as providing relief for the damages incurred and deterring others from committing the same harms. For purposes of this report, "malignant diseases" refer to those involving mesothelioma, lung cancer or other cancer while "nonmalignant diseases" refer to asbestosis and pleural diseases.

[2]Mesothelioma is a cancer of the mesothelium, a protective membrane that covers the internal organs. Mesothelioma is the most severe disease category recognized by asbestos trusts.

recorded as a separate cause-of-death category on death certificates until 1999 and is not recorded as a cause of death in all states or municipalities. Although lung cancer is reported as a cause of death, lung cancer caused by asbestos is not differentiated from other forms of lung cancer. In addition to potentially increasing the risk of mesothelioma, asbestos exposure has been linked to lung cancer and may be associated with other non-respiratory cancers, according to the Centers for Disease Control and Prevention and the National Cancer Institute at the National Institutes of Health. As a result of an incomplete history of asbestos-related diseases and because of the long latency period of these diseases, it is difficult to estimate the future trends of these diseases. Although estimating the number of past and future mesothelioma incidence is difficult, experts believe that the mesothelioma epidemic is receding with the peak number of incidence per year reaching approximately 2,500 in the United States in the early 2000s.[3]

To date, approximately 100 companies have declared bankruptcy at least partially due to asbestos-related liability. The large and unpredictable asbestos-related liability due to the number of individuals exposed and the number of asbestos related lawsuits filed in the tort system are factors that may contribute to the decision by companies facing asbestos-related liability to file for bankruptcy. Generally, filing for bankruptcy halts civil lawsuits and other actions against the debtor company (the company filing for bankruptcy) for the duration of the bankruptcy process.[4] For those companies seeking to reorganize pursuant to Chapter 11 of the federal bankruptcy code, 11 U.S.C. § 524(g) affords the debtor company an opportunity to channel (by way of a channeling injunction) all future asbestos-related liabilities to an asbestos personal injury trust established as part of the company's reorganization and in accordance with § 524(g)[5] Pursuant to § 524(g), the asbestos personal injury trust assumes the debtor company's asbestos-related liabilities while assets of

---

[3]RAND Corporation, *Asbestos Litigation*, RAND Institute for Civil Justice, MG-162 (2005) and Bertram Price and Adam Ware, *Mesothelioma Trends in the United States: An Update Based on Surveillance, Epidemiology, and End Results Data for 1973 and 2003*, volume 159, number 2 (2004).

[4]See 11 U.S.C. § 362.

[5]See 11 U.S.C. §§ 1101-46 (Chapter 11, Reorganization); 11 U.S.C. § 524(g) (allowing for the issuance of an injunction against future claims of liability for asbestos-related injuries against the debtor company if the confirmed plan for reorganization establishes a trust that assumes the liabilities of the debtor).

the debtor company are transferred to the asbestos trust for investment and management. The trusts then pay present and future asbestos-related claims, thus relieving the reorganized company of all present and future asbestos-related liabilities. Postbankruptcy, the trusts implement a nonadversarial administrative process—independent of the court system—to review claimants' occupational and medical histories before awarding compensation. The trusts operate without judicial or federal government oversight, but generally provide annual financial reports to the U.S. bankruptcy court of jurisdiction in accordance with provisions set forth in each trust's trust agreements (the instruments that establish a trust).

In the last decade, with the number of asbestos-related bankruptcies increasing, the number of asbestos personal injury trusts increased from 16 trusts with a combined total of $4.2 billion in assets in 2000 to 60 with a combined total of over $36.8 billion in assets in 2011. In addition to companies that have reorganized through the bankruptcy process, there are other solvent companies that remain vulnerable to asbestos-related lawsuits as defendants in the tort system. These companies, as well as their insurance carriers whose policies are often responsible for paying amounts awarded by settlement or verdict to asbestos victims, are interested in amounts paid to individuals by trusts because these amounts may be used to offset the amounts owed to prevailing plaintiffs by solvent companies.

In this overall context, you asked us to conduct a review of asbestos trusts set up in accordance with Chapter 11 and § 524(g) of the federal bankruptcy code. Specifically, this report addresses:

1. How much asbestos bankruptcy trusts have paid in claims and how those trusts are administered,

2. How trust claim and payment information is made available to outside parties, and

3. Stakeholder—plaintiff and defense attorneys, trust officials, and other interested parties— views on whether more trust and claimant information should be made available to outside parties and recent efforts to change the current trust system and processes.

To conduct our work, we obtained and analyzed publicly available documents related to asbestos trusts. To find these documents, we searched individual trust websites and the Public Access to Court

We determined that the scope and methodology of the RAND reports were sufficient for us to rely on their results. We also reviewed various applicable legislative and other proposals, as well as other actions intended to change the current asbestos trust and compensation systems and require additional disclosure of claimant information.

We conducted this performance audit from October 2010 through September 2011 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## History of Asbestos Use and Litigation

Asbestos is a naturally occurring silicate mineral that was widely used in the United States in the 20th century for industrial, commercial, and residential purposes primarily for its flame-retardant and insulating properties. Examples of products containing asbestos included roofing shingles, ceiling and floor tiles, paper and cement products, and friction products such as automobile clutch, brake and transmission parts. Figure 1 below provides an illustrative example of asbestos and some of the products in which asbestos was used.

asbestos exposure.[11] In 1973, the U.S. Court of Appeals for the Fifth Circuit issued the first appellate opinion upholding a product-liability judgment against a manufacturer of asbestos-containing products in *Borel v. Fibreboard*, finding that the asbestos manufacturers were liable to workers injured as a result of exposure to their asbestos-containing products.[12] In the course of the first successful personal injury lawsuits against asbestos manufacturers, plaintiffs' attorneys introduced evidence that these manufacturers had known but concealed information about the dangers of asbestos exposure or that such dangers were reasonably foreseeable.

## Section 524(g) and the Establishment of Personal Injury Trusts

Asbestos personal injury trusts, established in accordance with the federal bankruptcy code, implement compensation plans that, in general, recognize and protect the interests of present and future claimants, prioritize more seriously ill claimants, and establish processes for resolving disputes between the claimants and the trusts. A 1994 amendment to § 524 of the federal bankruptcy code in effect codified an approach for addressing a debtor company's asbestos-related liabilities while eliminating the possibility of that company being found liable for future asbestos-related personal injury claims.[13] Pursuant to § 524(g) debtor companies that face asbestos-related liability and file for bankruptcy under Chapter 11 may establish an asbestos personal injury trust that, by way of a channeling injunction, assumes the asbestos-related liabilities of the debtor company that will compensate present and future asbestos claimants. Filing for bankruptcy halts all civil lawsuits and

---

[11]See, e.g., 29 C.F.R. §§ 1910.1001 (addressing occupational exposure to asbestos in all industries covered by OSHA, except as otherwise provided); 1915.1001 (regulating asbestos exposure in shipyard employment work); and 1926.1101 (regulating asbestos exposure in construction work).

[12]*Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir. 1973).

[13]See Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 111, 108 Stat. 4106, 4113-17. More specifically, the 1994 amendment adding subsection (g) to § 524, in effect, codified the approach utilized in the Johns-Manville Corporation's bankruptcy. In that case, Johns-Manville filed for bankruptcy under Chapter 11 and, in accordance with its confirmed plan of reorganization, the company's asbestos-related liabilities were channeled to the Manville Personal Injury Settlement Trust by way of a court-imposed injunction, thus becoming the first asbestos trust responsible for processing and paying present and future asbestos personal injury claims. Lingering concerns as to whether the injunction issued as part of this plan could withstand all challenges underscored the 1994 amendment modeled after this approach.

other actions against the debtor company for the duration of the bankruptcy process and establishing an asbestos personal injury trust as part of the company's reorganization and in accordance with § 524(g) bankruptcy affords the debtor company an opportunity to transfer all future asbestos-related liabilities to the trust, thereby limiting the debtor company's asbestos-related liabilities.[14] The goal of the trusts is to compensate present and future claimants, equitably and outside the court system, by managing the debtor company's assets assumed by the trust as part of the bankruptcy reorganization. Figure 2 provides a timeline of events surrounding the establishment of asbestos trusts.

---

[14]See 11 U.S.C. § 362 (providing for a stay of actions commenced against a debtor); 11 U.S.C. §§ 1101-46 (Chapter 11, Reorganization); and 11 U.S.C. § 524(g) (allowing for the issuance of an injunction against future claims of liability for asbestos-related injuries against the debtor company if the confirmed plan for reorganization establishes a trust that assumes the liabilities of the debtor).

**Figure 2: Timeline of Events Surrounding the Establishment of Asbestos Trusts**



Source: GAO analysis.

To resolve their asbestos liabilities while at the same time continuing with general business operations, companies may seek to reorganize their debts by filing for bankruptcy under Chapter 11 and in accordance with § 524(g) of the federal bankruptcy code. In accordance with these provisions, a debtor company, creditors (that is, parties with claims against the debtor, including asbestos claimants), and as appropriate, other interested parties, such as insurance companies that may have issued liability insurance policies to the debtor company, will develop and propose a plan of reorganization. The plan will provide for the establishment of an asbestos personal injury trust to assume the asbestos-related liabilities of the debtor company and compensate present and future claimants for harm caused by exposure to asbestos.

The plan of reorganization must then be confirmed by the U.S. Bankruptcy Court and affirmed by the U.S. District Court of jurisdiction.[15] Once the reorganization plan is confirmed and the trust established, all asbestos personal injury claims originally intended for the debtor company must go through the trust. See figure 3 for the Chapter 11 bankruptcy process through which asbestos bankruptcy trusts are created.

---

[15] In some instances the U.S. District Court, and not the Bankruptcy Court, may confirm a plan of reorganization.

**Figure 3: Chapter 11 Bankruptcy Process through Which Asbestos Bankruptcy Trusts Are Created**



Sources: GAO analysis of U.S. Bankruptcy Code; and Art Explosion (photos).

When a company files a petition for bankruptcy under Chapter 11 with the U.S. bankruptcy court of appropriate jurisdiction, that court will preside over the debtor company's reorganization. Concurrently, United States Trustees or, where applicable, Bankruptcy Administrators, have

**Figure 4: Overview of the U.S. Bankruptcy System**

Source: GAO analysis; clipart photo Flickr.

## Organization and Administration of Trusts

For a debtor company to obtain the benefit of § 524(g) of the bankruptcy code the trust established as part of the company's plan for reorganization must operate through mechanisms that provide a reasonable assurance that the trust will increase in value, and be in a financial position to pay present and future demands that involve similar claims in substantially the same manner.[17] As part of the bankruptcy

---

[17]See 11 U.S.C. § 524(g)(2)(B)(ii)(V).

reorganization process, the creditors and the debtor establish the trust's administrative functions, amounts of compensation claimants may receive, and processes that determine whether a claimant is entitled to compensation. These are established and described in a trust's TA and TDP. The TA is the instrument that creates a trust and that describes the trust's purpose, acknowledges the transfer and acceptance of assets from the debtor company in exchange for assuming the debtor's liability, and describes key actors in the trust's administration. The TDP contains the processes that govern the review, valuing, and payment of asbestos-related personal injury claims.[18] Among other things, the TDP coordinates claim processing, assigns payment values for various asbestos-related diseases, sets medical criteria for the different diseases, prescribes procedures for reviewing the claims, and establishes a dispute resolution process. These provisions function to ensure that all claimants, both current and future, receive equitable compensation for their asbestos-related injuries.

The asbestos trusts are privately managed and are generally comprised of at least one or more trustees, a trust advisory committee (TAC), and a future claimants' representative (FCR). Trustees manage the daily operations of the trusts, including managing the trusts' investments, hiring and supervising support staff and advisers, filing taxes, and submitting annual reports to the bankruptcy court, as required by the trusts' TA. The trustees are to manage the trust for the sole benefit of the present and future claimant beneficiaries, who are represented by the TAC and the FCR, respectively. The TAC, a group established by the TA, and the FCR, a position statutorily required by § 524(g), both advise the trustees on and must generally consent to significant changes in trust administration and the implementation of the TDP.[19]

Although 60 companies subject to asbestos-related liabilities have filed for bankruptcy under Chapter 11 and established asbestos bankruptcy trusts in accordance with § 524(g), asbestos claimants can also seek compensation from potentially liable solvent companies (that is, a company that has not declared bankruptcy) through the tort system. In

---

[18]Some trusts refer to these as the Claims Resolution Procedures.

[19]11 U.S.C. § 524(g)(4)(B)(i) (requiring the court to appoint a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands against the debtor company for asbestos-related injuries).

such instances, trust compensation as well as a claimant's occupational exposure and medical evidence submitted to trusts may be taken into consideration. RAND's Institute for Civil Justice released a report in August 2011 addressing the potential effects of asbestos bankruptcy trusts on compensation in the tort system[20] At issue in the report is how the tort system takes into consideration compensation paid by trusts and the time at which a plaintiff must disclose trust submissions, focusing on selected states' practices and liability regimes. The report also examines how the establishment of the trusts potentially affects total plaintiff compensation and payments by the solvent defendants.

# Asbestos Trusts Have Paid at Least $17 Billion in Claims and Are Administered in Accordance with Trust Distribution Procedures

## Asbestos Bankruptcy Trust Payments

Since the establishment of the first trust in 1988 through 2010, available data indicate that asbestos trusts have paid about 3.3 million claims valued at about $17.5 billion. Trusts typically report the number of claims paid and the value of these claims in annual reports submitted to the bankruptcy court, which are generally available to the public. In 2010, the RAND Corporation reported that from 1988 through 2008, trusts paid about 2.4 million claims totaling $10.9 billion with about 575,000 claims totaling $3.3 billion in 2008.[21] We reviewed available 2009 and 2010 annual financial reports and found that these trusts paid approximately 443,000 additional claims totaling $3.6 billion in 2009 and approximately

---

[20]RAND Corporation, *Asbestos Bankruptcy Trusts and Tort Compensation*, RAND Institute for Civil Justice, MG-1104 (2011).

[21]RAND Corporation, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts*, RAND Institute for Civil Justice, TR-872-ICJ (2010).

461,000 more claims totaling $3 billion in 2010. The number and value of claims paid presented above provides a conservative estimate of total trust payments since 1988. RAND Corporation reported that its data provide the lower bounds because data on the number and value of claims paid are incomplete for some trusts' payments prior to 2006. Although we were able to collect 47 (84 percent) of the 56 trusts' annual reports for 2009 and 47 (81 percent) of the 58 trusts' annual reports for 2010, some trusts' annual reports may not be publicly or readily available. Four of the trusts did not have 2009 annual reports because the trusts were newly established or were established in 2010 or 2011. Two of these trusts also did not have 2010 annual reports available because the trusts were newly established or were established in 2011. In addition, annual reports may have been filed under seal with the Bankruptcy Court for reasons deemed appropriate by the court, according to U.S. Bankruptcy Court judges we interviewed.

## Asbestos Trusts Assess and Pay Claims in Accordance with Trust Distribution Procedures

Each asbestos trust has a TDP that governs the administration of the trust and establishes the process for assessing and paying claims. Claims that meet the criteria documented in the TDP are paid as a percentage of the scheduled value specified in the TDP as discussed below. TDPs may also include a claim payment ratio provision that specifies the amount of payments that the trust may allocate for the most serious claims (malignancies, serious asbestosis) versus the less serious claims each year. Such provisions serve to prioritize the more serious claims to ensure that less serious claims do not absorb the bulk of available assets each year simply because there are more of them.[22] The ratio is different in each trust, but trusts may allocate 80 percent or more of their available assets to the more serious claims.

Trusts typically offer claimants two options for claim review, either expedited review or individual review. Under expedited review, claims that meet the medical and exposure criteria for the alleged disease (referred to as the disease level) are to be assigned a scheduled value for the disease. The trusts seek to achieve relative equity among claimants by establishing these scheduled values. A claim that meets the criteria

---

[22]TDP's will also generally provide for a limit on the amount of payments a trust will make each year, referred to as the "maximum annual payment." In the event payment of a claim would cause a trust to exceed the maximum annual payment threshold, that claim shall generally be carried over into the next year.

documented in the TDP typically includes a completed claim form with documented evidence of exposure to asbestos products. Such evidence of exposure may consist of the claimant's work history, Social Security records, invoices, employer records, or deposition testimony of the claimant or coworkers taken in asbestos litigation. The claimant, or attorney acting on the claimant's behalf, also submits medical reports or records sufficient to support a diagnosis for the specific disease being claimed or, if applicable, a copy of a death certificate.[23] As an alternative to expedited review, individual review provides a claimant the opportunity to receive individual consideration of his or her medical condition and of the claim's value. Some categories of disease may be compensated only through individual review (i.e., lung cancer without underlying asbestosis). In the individual review process, the trust may be able to take into account factors relevant to the individual claimant (dependants, pain and suffering, for example) and factors relevant to the litigation posture of the claim were it to have been pursued in the tort system (such as the jurisdiction and the track record of the law firm representing the claimant). Payment for an individual review claim can be higher or lower than a claim in the expedited process. In general, under either expedited or individual review process, claims are paid according to a first-in, first-out (FIFO) rule, processing each claim based on the date the claim was filed. Based on our review of 52 of 60 TDPs and our interviews with officials from 11 trusts, the process for assessing and paying claims typically follows the process shown in figure 5.

---

[23]Claims may be filed on behalf of deceased claimants.

**Figure 5: Asbestos Trust Claim Process**

**Intake**

Claimant submits claim and supporting documents electronically or manually

Claim enters trust's claims processing system in expedited or individual queue, and is assigned a place in the order received (FIFO queue)

**Evaluation/ quality assurance**

Claim is reviewed by trustee and claims processing center or outsourced to claims processing facility. Claims may be subject to additional audits.

Deficient claims are returned to claimant for additional evidence or information

Is claim deficient?

No

Yes

Approved claims may undergo a quality assurance review

Trust sends claimant an offer and release

**Offer acceptance and payment**

Does claimant accept offer?

No

Yes

Alternative dispute resolution/Arbitration

Does claimant accept offer?

No

Yes

Claimant may choose to file a lawsuit against the trust

Claim is paid in accordance with established payment percentages of the claim's liquidated value set forth in the TDP

Source: GAO analysis of asbestos trust claim process.

**Intake of claims**. Based on our review of 52 of 60 TDPs and interviews with 11 trusts, claims and supporting documents are filed electronically or manually. Upon review of a claim and supporting documents, the trust's claim processing facility begins the review process in accordance with the method selected by the claimant. A claimant chooses the expedited or individual review process, both of which are separately processed through the FIFO queue. Two to 3 percent of claims are processed through the individual review process, while most claims flow through the expedited claims queue. Claims processed through the expedited review claims queue are paid the scheduled values for disease level as set forth in the TDP.

A claimant may elect to have a claim undergo the individual review process for purposes of determining whether the liquidated value exceeds the TDP's scheduled value, or if the claim does not meet the presumptive medical criteria for any of the disease levels in the TDP. A claimant can demonstrate exposure to an asbestos-related product in a variety of ways. For example, an asbestos claimant diagnosed with mesothelioma or asbestos lung cancer and who is receiving chemotherapy could be a male age 60 or older who has worked for construction companies at numerous work sites and shipyards where he was exposed to various asbestos-containing products for an extended period of time. This claimant files claims with several trusts where the now reorganized companies' products or operations are identified at those specific work sites. For occupational exposure evidence, the claimant may provide a trust with Social Security records in support of the claim to document where the claimant was employed at the time of exposure. The record may indicate that the claimant was employed by a specific company that was known to have used asbestos products; however, there may not be a direct link between the claimant's exposure to the product at the company. Under these circumstances, trusts may solicit work histories from the claimant's company in support of the claim. However, it is possible that accurate work records may not exist due to, for example, the passing of a substantial amount of time between exposure and the date a claim is filed, and the trust, therefore, may have to rely on depositions from other parties or even professional judgment that considers all available information.

**Evaluation of claims**. The process for evaluating claims varies across trusts. Seven of the eight large trusts we interviewed told us they rely on claims processing companies to assess claims against the criteria outlined in the trusts' TDPs. Officials we interviewed at 9 of the 11 trusts said they have internal claims reviewers to determine whether the claimant's medical and exposure evidence satisfies the requirements

outlined in the TDP. If a trust has any concerns about a claim, the trust may request the claimant provide additional documentation, such as other independent medical records. Officials we interviewed at 5 of the 11 trusts told us they also track public information and court filings to determine if questions are raised in the tort system about the authenticity of information and claims filed by a particular lawyer or claimant. In cases where questions are raised about the validity of claims from particular individuals, trusts officials stated that they will further inspect such claims.

**Payment process.** If a trust determines that a claim meets the criteria documented in the TDP, the trust is to make the claimant an offer based on a percentage of the scheduled disease value specified in the TDP.[24] Most trusts cannot pay the full value of a claim and still maintain sufficient assets to compensate all present and future claimants. As a result, trusts determine a payment percentage, a fraction of the full value that can be paid to present claimants and still maintain sufficient assets for future claims. Payment percentages vary across trusts and TDPs we reviewed specify a range of payment percentages from 1.1 percent to 100 percent for certain diseases, such as mesothelioma or asbestosis. The median payment percentage across trusts is 25 percent, according to the 2010 RAND Corporation study.[25] Periodically, trustees will calculate what the trust can afford to pay based on the assets it has on hand, and what those assets are expected to earn in the future. For example, a trust with a scheduled disease value of $100,000 for a specific disease type, such as mesothelioma or asbestosis, that applies a payment percentage of 44 percent would pay a claimant $44,000. In arriving at a payment percentage, the trustees, the TAC, and FCR review the trust's claim statistics and compare those to the original forecasts made of the volume and value of claims at the time the trust was created. The trustees review the payment schedule periodically and may adjust it, up or down, based on what assets are available to meet a trust's present and future

---

[24]The payment percentage is a percentage applied to the value that a trust assigns to a disease to determine the amount that will be actually paid to the claimant. Payment percentages are initially set during trust formation but may be changed by the trustee or trustees with the consent of the trust advisory committee and the future claimants' representative. Payment percentages are used as a means to preserve trust assets to pay future unknown claims.

[25]RAND Corporation, Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts, RAND Institute for Civil Justice, TR-872-ICJ (2010).

liabilities.[26] The TAC and FCR must generally consent to any changes that are made to the payment percentage. If the claimant accepts the trusts' offer, the claim is paid. If the claimant rejects the offer, the claimant may enter into alternate dispute resolution, as set forth in the TDP. If the issue is not resolved through alternate dispute resolution, the claimant may file a lawsuit in the tort system against the trust in an appropriate court of jurisdiction regarding the amount of compensation offered by the trust.

**Figure 6: Key Actors Involved In the Asbestos Bankruptcy Trust Payment Process**



Source: GAO analysis of asbestos trust claim process.

**Quality Assurance and Audit programs**. Fifty (98 percent) of the 52 TDPs we reviewed contained a provision requiring that the trusts conduct a claims audit program. These TDPs provide that the trustees, with the consent of the TAC and FCR may develop methods for auditing the

---

[26]If the payment percentage is increased, the trust will generally make supplemental payments to all claimants who previously liquidated their claims against the trust and received payments based on a lower payment percentage, as set forth in each trust's TDP.

**MURPHY V. VINSON LAW OFFICE, PA, ET AL,
CASE NO.**

**EXHIBIT 2**

Vinson Law Office Advertising Mailers to Navy Veterans (2020-
2023).



August 2022 -
Wife Megan &
Ben Vinson
celebrate
Vinson Law's
10 Year
Anniversary!



# VINSON LAW

## Serving Those Who Served

**Our Nation will remain home of the free so long as it is land of the brave.**
**- Mr. Elmer Davis, Office of War Information, World War II**

*Advertisement*, if you have
already obtained a lawyer for
this matter, please disregard.

**Issue #24**
**11/11/22**

## In the Spotlight...

September 2022 -
Vinson Law learns
about Engine and Boiler
Room repairs on the
USS Yorktown (CV-10).



The Yorktown is a steam-
powered WW2-era ship
that was loaded with
asbestos. The asbestos
industry knew its harm
since the 1930s and failed
to warn sailors.

September 2022 - Firm staff
volunteers for Meals on Wheels,
delivering hot meals and spending
time with seniors in need.



## HAPPY VETERANS DAY from OUR FAMILY TO YOURS‼

### PRESIDENT GEORGE W. BUSH, 11/11/02:

We gather this morning to show our gratitude to the Veterans of
the United States Armed Forces. Here and across the nation, Americans
are marking this day with expressions of respect for all who have worn
the uniform of our country. Veterans do not take life for granted. They
know that duty and sacrifice are more than words. And they love
America deeply, because they know the cost of freedom, and they know
the names and faces of men and women who paid for it.

The term "Veteran" conveys more than a rank held in the past.
Every person who has put on the uniform, whether in time of war or in
time of peace, has also felt a new sense of responsibility. Long after their
honorable discharge, our Veterans still symbolize what it means to be
a citizen. Go to any community in this country and you will find
Veterans in positions of service and leadership. In so many ways,
Veterans live out the meaning of patriotism and idealism and concern for
others. Those of us who are the children and grandchildren of Veterans
have seen those qualities up close -- each of us is better because of
the influence of a Veteran. And so is America.

**Vinson Law Address: 5505 W. Gray St., Tampa, FL, 33609, Email: Ben@VinsonLegal.com**
Website: www.VinsonLegal.com. FL Bar since 4/10/2012, 4 cases tried, 10 years experience.
2 multi-million dollar verdicts. **40+ Million Dollars paid to our clients in past 3 1/2 yrs
alone.** Name/address from cruisebooks/musterrolls/tincansailors/shipreunion/hullnumber/decklog/
navybuddies.com listing sailors on ships **loaded with asbestos. Thank you for your service!!**

### If You Were Exposed to Asbestos **and** Have:
#### Shortness of Breath when you Exert Yourself
**Lung Cancer, Mesothelioma,** or **Asbestosis-COPD**, even if a smoker
CALL NOW FOR A FREE CONSULATION:
### TOLL-FREE 1-888-513-8593

Vets suffering from **severe** lung disease are eligible for up to
**$200,000** without filing a lawsuit & at **no out-of-pocket cost.**
Claims handled nationwide, and they DO NOT affect VA disability.
We are VA certified & Better Business Bureau A+ Rated.



Bucs Win! - Ben, Megan, and 3 boys Andrew (8 years), Davis (3 - his first game!), & Smith (6)



### In the Spotlight...

Dec. 20, 2022 - Vinson Law Staff volunteers with Meals on Wheels, delivers hot meals to seniors in need and spends quality time with them.



Firm Christmas Celebration!

April 1-7, 2004 - President George W. Bush founds Global Asbestos Awareness Week. 150,000 Americans suffer from asbestos disease, 100% preventable for sailors had the industry warned.

**GLOBAL ASBESTOS AWARENESS WEEK**



---

**Advertisement**, if you have already obtained a lawyer for this matter, please disregard.

Issue #25
2/20/23

## VINSON LAW

### Serving Those Who Served

"America without her Sailors would be like God without His Angels" - Claudia Pemberton

## HAPPY PRESIDENTS DAY from OUR FAMILY to YOURS

### RONALD REAGAN - D-DAY 40th ANNIVERSARY, 6/6/84:

You Veterans knew that some things are worth dying for. One's country is worth dying for, and democracy is worth dying for, because it's the most deeply honorable form of government ever devised by man. All of you loved liberty. All of you were willing to fight tyranny, and you knew the people of your countries were behind you.

Something else helped the men of D-day: their rock hard belief that Providence would have a great hand in the events that would unfold here; that God was an ally in this great cause. And so, the night before the invasion, when Colonel Wolverton asked his parachute troops to kneel with him in prayer he told them: Do not bow your heads, but look up so you can see God and ask His blessing in what we're about to do. Also that night, General Matthew Ridgway on his cot, listening in the darkness for the promise God made to Joshua: "I will not fail thee nor forsake thee."

Particularly today, it is good and fitting to renew our commitment to each other, to our freedom, and to the alliance that protects it. Thank you very much, and God bless you all.

Vinson Law Address: 5505 W. Gray St., Tampa, FL, 33609, Email: Ben@VinsonLegal.com
Website: www.VinsonLegal.com. FL. Bar since 4/10/2012, 4 cases tried, 10 years experience. 2 multi-million dollar verdicts. 45+ Million Dollars paid to our clients in past 4 yrs. alone. Name/address from cruisebooks/musterrolls/tincansailors/shipreunion/hullnumber/decklog/navybuddies.com listing sailors on ships loaded with asbestos. Thank you for your service!!

### If You Were Exposed to Asbestos and Have:

**Shortness of Breath when you Exert Yourself**

Lung Cancer, Mesothelioma, or Asbestosis-COPD, even if a smoker

CALL NOW FOR A FREE CONSULATION:

## TOLL-FREE 1-888-513-8593

Vets suffering from **severe** lung disease are eligible for up to **$200,000** without filing a lawsuit & at **no out-of-pocket cost.** Claims handled nationwide, and they DO NOT affect VA disability. We are VA certified & Better Business Bureau A+ Rated.



11/22 - Kids' charity shoot raises $87,803! Ben Vinson wins 1st of 500 male shooters.

2022 Frenchy's Big Clays for Kids **Top Male Shooter**



# VINSON LAW

## Serving Those Who Served

**"Freedom isn't free." - Col. William Hitchcock**

**Advertisement**, if you have already obtained a lawyer for this matter, please disregard.

**Issue #26**
**7/4/23**

## In the Spotlight...

March '23 - Vinson Law learns more about Engine and Boiler Room repairs on the USS American Victory. The Victory is a steam-powered WW2-era ship that was loaded with asbestos.



The asbestos industry knew its hazards since the 1930s and failed to warn sailors.

## HAPPY 4TH OF JULY from OUR FAMILY to YOURS!!

President Ronald Reagan on Freedom:

Freedom is never more than one generation away from extinction. We didn't pass it to our children in the bloodstream. It must be fought for, protected, and handed down for them to do the same, or one day we will spend our sunset years telling our children and our children's children what it was once like in the United States where men were free.

Freedom and law must be indivisible partners. For without law, there can be no freedom, only chaos and disorder. And without freedom, law is but a cynical veneer for injustice and oppression.

If we look to the answer as to why for so many years we achieved so much, prospered as no other people on earth, it was because here in this land we unleashed the energy and individual genius of man to a greater extent than has ever been done before. Freedom and the dignity of the individual have been more available and assured here than in any other place on earth.

**Vinson Law Address:** 5505 W. Gray St., Tampa, FL, 33609, **Email:** Ben@VinsonLegal.com
Website: www.VinsonLegal.com. FL Bar since 4/10/2012, 4 cases tried, 10 years experience. 2 multi-million dollar verdicts. 45+ Million Dollars paid to our clients in past 4 yrs. alone. Name/address from cruisebooks/musterrolls/tincansailors/shipreunion/hullnumber/decklog/navybuddies.com listing sailors on ships **loaded with asbestos. Thank you for your service!!**

Naval Fireman Veteran client Mr. Doyle Ford & his service dog (right). 2/25/23 - Staff volunteer for Paws for Heroes 5K.



The PAWS 4 HEROES 5K Thanks Our FOX LEVEL SPONSOR
VINSON LAW





### If You Were Exposed to Asbestos **and** Have:
**Shortness of Breath when you Exert Yourself**
**Lung Cancer, Mesothelioma,** or **Asbestosis-COPD,** even if a smoker
CALL NOW FOR A FREE CONSULTATION:
**TOLL-FREE 1-888-513-8593**

Vets suffering from **severe** lung disease are eligible for up to **$200,000** without filing a lawsuit & at **no out-of-pocket cost.**
Claims handled **nationwide,** and they DO NOT affect VA disability.
We are VA certified & **Better Business Bureau A+ Rated.**



*Advertisement*, if you have already obtained a lawyer for this matter, please disregard.

**Issue #27**
**11/11/23**

# VINSON LAW

## Serving Those Who Served

*"Freedom is never given; it is won." - A. Philip Randolph*

**7/23 -Vinson Family enjoys Antler Hill Farm**

## In the Spotlight...

6/23 - Vinson Law staff volunteer their time as stewards of the great outdoors!





**Mr. LeRoy Pacheco**
Machinist Mate 1957 - 1962

*"I would like to extend my deepest appreciation for your professional service! Your law firm has kept me informed and up to date every step of the way. You make a stressful situation so much easier. I would highly recommend any service member exposed to asbestos to contact Vinson Law."*

**9/9/23 - Paige, Mollie, Heather, Caity volunteer at Veteran Approved Network Fallen Heroes Race.**



# HAPPY VETERANS DAY from OUR FAMILY to YOURS!!

President Lyndon B. Johnson, 1968:

Each year we pause to pay Veterans tribute. In our prayers and thoughts and ceremonies, we honor the men to whom we owe our safety, our freedom, and the continued existence of our Nation. For this purpose, Congress has designated the eleventh of November as a legal holiday to be known as Veterans Day, and has dedicated it to the cause of world peace.

I direct the appropriate officials of the Government to arrange for the display of the flag of the United States on all public buildings on that day; and I request the officials of Federal, State, and local governments, and civic and patriotic organizations, to give their enthusiastic leadership and support to appropriate public ceremonies throughout the nation.

I ask that all citizens of every age take part in these observances which honor those whose unqualified loyalty and patriotism have preserved our freedom.

**Vinson Law Address: 5505 W. Gray St., Tampa, FL, 33609, Email: Ben@VinsonLegal.com**
Website: www.VinsonLegal.com. FL Bar since 4/10/2012, 4 cases tried, 11 years experience. 2 multi-million dollar verdicts. $50+ Million Dollars paid to our clients. Names/addresses obtained from cruisebooks/musterrolls/tincansailors/shipreunion/hullnumber/decklog/navybuddies.com listing sailors on ships **loaded with asbestos**. **Thank you for your service!!**

## If You Were Exposed to Asbestos and Have:

__Shortness of Breath when you Exert Yourself__, digestive cancers, **Lung Cancer, Mesothelioma,** or **Asbestosis-COPD**, even if a smoker
CALL NOW FOR A FREE CONSULTATION:
## TOLL-FREE 1-888-513-8593

Vets suffering from **severe** lung disease are eligible for **up to $190,000** without filing a lawsuit & at **no out-of-pocket cost.** Claims handled **nationwide**, and they DO NOT affect VA disability. We are VA certified & **Better Business Bureau A+ Rated**